Octavio Cardona-Loya II, Esq. SBN 255309
Golden & Cardona-Loya, LLP
3130 Bonita Road, Suite 200-B
Chula Vista, CA  91910
vito@goldencardona.com
Phone: 619-476-0030; Fax: 775-898-5471
Attorney for Plaintiff Ademar A. Marques

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEMAR A. MARQUES, an individual,<br><br>　　　　Plaintiff,<br><br>v.<br><br>WELLS FARGO HOME MORTGAGE, INC. dba AMERICA'S SERVICING COMPANY; a corporation;  and DOES 1 through 10 inclusive,<br><br>　　　　Defendants. | Civil No.: 09-cv-1985-L (RBB)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES:**<br>　**1) Breaches of Written Contracts,**<br>　**2) Declaratory Relief, and**<br>　**3) Unlawful and Unfair Acts and Practices.** |

## I. INTRODUCTION

1.　Defendant WELLS FARGO HOME MORTGAGE, INC. dba AMERICA'S SERVICING COMPANY ("ASC") contracted with Fannie Mae to provide foreclosure prevention services intending to benefit homeowners with affordable loan modifications. In return, ASC is able to receive $2,873,000,000 in taxpayer funds as incentive to do so. ASC however refused to comply with the terms of the contract of which Plaintiff is a third-party beneficiary and foreclosed on Plaintiff's home.

////

## II. VENUE

2. Defendant removed this action based upon federal question jurisdiction under 28 U.S.C. §1331.

## III. PARTIES

3. Plaintiff at all times relevant resided at 4431 Paola Way, San Diego, CA 92117 ("Plaintiff's Home").

4. Defendant **WELLS FARGO HOME MORTGAGE, INC. dba AMERICA'S SERVICING COMPANY ("ASC")** at all times relevant was a corporation doing business in San Diego County, California operating from an address at 1 Home Campus MAC X2401-049, Des Moines, IA 50328.

5. The true names and capacities, whether individual, corporate (including officers and directors thereof), associates or otherwise of Defendants sued herein as DOES 1 through 20, inclusive, are unknown to Plaintiff, who therefore sue these Defendants by such fictitious names. Plaintiff is informed and believes, and alleges that each Defendant designated as a DOE is involved in or is in some manner responsible as a principal, beneficiary, agent, dual agent, co-conspirator, joint venturer, alter ego, third party beneficiary, or otherwise, for the agreements, transactions, events and/or acts hereinafter described, and thereby proximately caused injuries and damages to Plaintiff. Plaintiff requests that when the true names and capacities of these DOE Defendants are ascertained, they may be inserted in all subsequent proceedings, and that this action may proceed against them under their true names.

## IV. FACTUAL ALLEGATIONS

6. Plaintiff Ademar A. Marques refinanced his home where he lives with his wife, two daughters, and grandson.

7. Plaintiff has no experience beyond basic financial matters.

8. In September of 2005, Plaintiff took out a loan (the Loan) with Centex Home Equity Co., LLC.

9. Plaintiff relied on and placed his trust and confidence in Centex and its broker, expecting an honest and accurate representation of the Loan terms and documents; neither Centex nor its agent represented the Loan and terms accurately.

10. At the time of taking out the Loan, Plaintiff was deceived by Centex and its agent as to the true nature and ramifications of the Loan.

***ASC'S Failure to Comply With the Home Affordable Modification Program***

11. On March 4, 2009 President Obama signed into law the Making Home Affordable Plan as part of the Emergency Economic Stabilization Act of 2008. It is in two parts: the *Home Affordable Refinance* program and the *Home Affordable Modification Program* (HAMP).

12. On April 13, 2009, ASC entered into a Servicer Participation Agreement for the *Home Affordable Modification Program* (the "Contract") with Fannie Mae; the latter acted as Financial Agent of the United States. The Contract is attached as Exhibit 1.

13. If a borrower under a loan serviced or owned by ASC seeks modification, the Contract requires ASC to first determine eligibility requirements of the borrower and the loan in question.

14. If the borrower and the loan are eligible, ASC must then perform a Net Present Value (NPV) Test to compare the value of the money that it would receive if the loan were modified with what the value it could expect from foreclosure.

15. If ASC, as servicer and owner the Loan, can expect a greater return from modifying the loan, the loan is considered NPV positive; ASC then **must** modify the loan absent fraud.

16. As a servicer of the loan, as opposed to being the owner of the loan, ASC **must** modify the loan unless the contractual agreement it has with the actual Holder of the loan prohibits modification. In that case, ASC is required to use reasonable efforts to obtain waivers or approval of a modification from the Holder.

17. Plaintiff is informed and believes the current investor allows modifications of its loans, including the Loan.

18. To date, ASC has not indicated that the Loan cannot be modified pursuant to HAMP's terms.

19. The modification must result in a monthly payment that includes principal, interest, property taxes and insurance, and any other pertinent fees such as Homeowner Association Dues. The resultant payment cannot exceed 38% of the borrower's gross income. See Exhibit 2, Home Affordable Modification Program Guidelines, March 4, 2009 and Exhibit 3, U.S. Department of the Treasury Making Home Affordable Summary of Guidelines.

20. Plaintiff, at all times relevant, was the current owner and occupied Plaintiff's Home; the Home was not investor owned, vacant, or condemned.

21. Plaintiff's Home is a single-family property and is Plaintiff's primary residence.

22. The total amount of the unpaid balance of the Loan does not exceed the Contract's maximum amount of $729,750 for qualification. (Exhibit 5.)

23. Under the Contract's Guidelines, Plaintiff, his loan, and his home qualify for a modification under the Contract's Qualification Terms. (Exhibit 2 at p. 2.)

24. Plaintiff's gross monthly income is approximately $2,850; a 38% monthly payment would be $1,083.

25. After deducting tax and insurance payments, $783 will apply to the loan each month.

26. Amortized over 40 years, a stream of payments under the Contract results in a Net Present Value of approximately $390,000.

27. ASC refused to offer such a modification under the Contract.

28. ASC agreed to temporarily suspend foreclosure action while qualified borrowers, such as Plaintiff, are being considered for "alternative foreclosure prevention options." (Exhibit 2 at p. 3.)

29. However, ASC instructed its sale trustee, NDEx West to sell Plaintiff's Home at auction.

30. ASC failed to comply with the conditions of the Contract.

### *ASC'S Efforts to Foreclose on Plaintiff's Home*

31. On August 11, 2008, ASC caused a Notice of Default to be recorded with the San Diego County Recorder; Document No. 2008-0426801, thus initiating the trustee's sale process to foreclose on Plaintiff's Home.

32. On November 14, 2008, ASC caused a Notice of Trustee's Sale to be recorded; Document No. 2008-0591866.

33. Plaintiff's Home sold at auction on December 2, 2008 for **$329,250**; a Trustee's Deed Upon Sale was recorded December 4, 2008; Document No. 2008-0626214. A true and correct copy of the recorded Trustee's Deed Upon Sale is attached as Exhibit 4.

34. $329,250 is approximately what defendants can expect to garner by foreclosing again, minus the costs associated with selling and ouster.

35. At all times relevant, The Net Present Value of modification exceeded that of foreclosure.

36. NDEx West, LLC, upon instructions by Defendants rescinded the sale of Plaintiff's Home by recording a Notice of Rescission of Trustee's Deed Upon Sale.

37. Plaintiff continues to be the trustor and assessed owner of Plaintiff's Home.

38. In the morning of July 17, 2009, Plaintiff found a copy of an unrecorded Notice of Trustee's Sale with a sale date of August 6, 2009. A copy of this Notice is attached as Exhibit 5.

### *Plaintiff's Efforts to Obtain a HAMP-Compliant Modification*

39. Through counsel, Plaintiff requested a modification of his loan from ASC pursuant to HAMP in August of 2009.

40. Throughout the course of litigation, Plaintiff's counsel continued requests for modification from ASC's counsel under HAMP.

////

41. Plaintiff, through counsel, provided financial documentation to support his request for modification under HAMP.

42. On or about November 5, 2009, ASC's counsel informed Plaintiff's counsel via email that Plaintiff had been given a modification.

43. Based on the terms of the proposed modification, it appeared Plaintiff was offered a modification.

44. The text of the email read: "Just got word from Wells that it can offer the following loan modification to Marques:

* 3 month initial mod with payments of $2,284.35 with a review for full modification after successful completion of the plan.

* The payments are based off of an interest rate reduction to 2.000% for the remaining term of 324 months and waiving all delinquent interest.

* The first payment for the initial mod will likely be due 12/01/2009.

Also, with any mod agreement, your client would have to sign a release of all claims against Wells Fargo. Let me know if this works and I'll tell Wells to get the docs prepared."

45. Plaintiff accepted the November 5, 2009 modification offer and requested the paperwork to be processed so that Plaintiff could begin making payments under the trial period.

46. Based upon this email, it appeared Plaintiff was offered a HAMP modification with a three-month trial period.

47. ASC, however, failed to provide any modification documents.

48. On or about November 25, 2009, ASC provided a "Stipulated Partial Reinstatement/Repayment Agreement."

49. The word "modification" is nowhere to be found in the Repayment Agreement.

50. The Repayment Agreement merely provided a forbearance which would not modify the terms of the Plaintiff's Loan.

////

51. Plaintiff previously received a forbearance which did not assist him and he did not accept this Repayment Agreement as its terms conflicted with the November 5, 2009 modification offer.

52. Fearing a mix-up on ASC's end, Plaintiff mailed a check, dated November 27, 2009, in the amount $2,284.35 as referenced in the November 5, 2009 modification offer so he did not lose any potential rights.

53. On or about December 2, 2009, ASC's counsel stated that Plaintiff could not qualify under HAMP as his loan was "not a Fannie/Freddie loan."

54. A loan need not be a Fannie Mae of Freddie Mac loan for qualification under HAMP, however.

55. Plaintiff's counsel informed ASC's counsel that the Fannie/Freddie status does not affect eligibility under HAMP and provided the government-operated websites indicating so via email.

56. ASC returned the November 27, 2009 check to Plaintiff on or about December 17, 2009.

57. On or about January 8, 2010, Plaintiff's counsel inquired as to further postponement of the sale date of the Plaintiff's home.

58. ASC's counsel stated that the forbearance agreement offered was the company's only offer and that any further requests would restart the review process.

59. ASC's counsel further stated it could not guarantee further postponement.

60. Plaintiff's counsel requested the process be restarted.

61. On or about March 18, 2010, Plaintiff's counsel contacted ASC's counsel regarding a status update and request to continue postponing the foreclosure sale date.

62. ASC's counsel indicated that ASC has not "gotten back to" him, or words to that effect, with an update.

63. ASC later foreclosed on Plaintiff's home; a Trustee's Deed Upon Sale was recorded on or about March 30, 2010 with the San Diego County Recorder.

////

64. Plaintiff is informed and believes that ASC failed to consider his Loan under HAMP's guidelines.

65. Plaintiff is informed and believes that ASC failed to conduct the relevant Net Present Value analysis as required under HAMP.

66. ASC failed to provide Plaintiff with a HAMP-compliant modification.

67. ASC failed to provide any documentation and/or justification as to why a HAMP modification was not offered to Plaintiff.

68. On or about March 23, 2010, Plaintiff's counsel spoke with ASC's counsel regarding the Plaintiff's options to keep his home.

69. ASC's counsel indicated that foreclosure was a "business decision," or words to that effect.

70. Plaintiff, through counsel, offered to repurchase his home and even offered a down payment of at least $50,000.

71. ASC's counsel later stated such an arrangement was not feasible.

72. ASC and its investor, U.S. Bank, initiated an unlawful detainer action against Plaintiff in the Superior Court of California, County of San Diego, Case No.: 37-2010-00044202-CL-UD-CTL.

73. In an effort to buy as much time as possible, Plaintiff stipulated to judgment and will remain in his home for two months paying rent at $1,500.

74. Plaintiff now has a lockout date of October 4, 2010.

75. Plaintiff will move for a restraining order and/or injunction unless ASC either 1) rescinds the foreclosure, 2) provides documentation indicating why a HAMP modification was not feasible under his circumstances and written evaluation of Plaintiff's loan under the Net Present Value Test, or 3) the investor agrees to continue allowing Plaintiff and his family to remain in the home paying a monthly rent of $1,500 until resolution of this matter.

////

////

## V. FIRST CAUSE OF ACTION

### (Breaches of Written Contracts)

76. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

77. Plaintiff is a Third-Party Beneficiary to the Contract; ASC and Fannie Mae intended Plaintiff to benefit under the Contract.

78. ASC unjustifiably and inexcusably breached the Contract by failing to perform its obligations thereunder as described above.

79. ASC'S breach of the Contract resulted in the foreclosure of Plaintiff's Home.

80. Pursuant to Civil Code Section 1559, Plaintiff may enforce the Contract's provisions.

81. ASC further breached the contract wherein it offered Plaintiff a loan modification on November 5, 2009.

82. Plaintiff accepted the offer and sent a check in furtherance and thus accepting the offer.

83. Plaintiff failed to make good on its November 5, 2009 offer causing a second breach of contract.

84. Plaintiff seeks damages according to proof and reserves his rights to seek equitable remedies to rescind the sale of his home.

## VI. SECOND CAUSE OF ACTION

### (Declaratory Relief)

85. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

86. Defendants contend that they have the right to foreclose on Plaintiff's Home, and conduct a trustee's sale relative to that property, and evict him.

////

87. Plaintiff contends that Defendants did not have a right to foreclose on Plaintiff's Home and conduct a trustee's sale relative to that property as Defendants have not complied with their contractual obligations under HAMP and that they do not have a right to evict him.

88. An actual controversy presently exists between Plaintiff and Defendants as to the existence of the ability or right to foreclose on Plaintiff's Home and evict. A judicial decision is necessary and appropriate at this time so that Plaintiff and Defendants may ascertain their respective rights relative to Plaintiff's Home.

## VII. THIRD CAUSE OF ACTION

### (Unlawful and Unfair Acts and Practices)

89. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

90. Defendants' violations and tortious conduct -

    (a)    ASC'S Breach of Contract,

- is an unlawful and unfair business practice or act under the Unfair Competition Law of Business and Professions Code §17200, *et seq*.

91. Plaintiff will seek to rescind the foreclosure of his home and restitution of his home, including lost monies, attorney fees and any civil penalties and other relief that the court deems appropriate.

////
////
////
////
////
////
////
////

## VIII. REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment against Defendants and each of them, for the following:

1. Actual damages;
2. Declaratory relief;
3. An injunction prohibiting the lockout of Plaintiff from his home; and
4. For such other and further relief as the Court may deem just and proper.

GOLDEN & CARDONA-LOYA, LLP

Dated: August 27, 2010        /s/ Octavio Cardona-Loya II
Octavio Cardona-Loya II,
Attorney for Plaintiff